United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued December 7, 1998 Decided February 26, 1999 

 No. 98-1184

 Sundor Brands, Inc., 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 On Petition for Review and Cross-Application 

 for Enforcement of an Order of the 

 National Labor Relations Board

 Terrence J. Nolan argued the cause for petitioner. With 
him on the briefs was Christopher H. Mills.

 Fred B. Jacob, Attorney, National Labor Relations Board, 
argued the cause for respondent. With him on the brief were 
Linda Sher, Associate General Counsel, John D. Burgoyne, 
Acting Deputy Associate General Counsel, and Fred L. Corn-
nell, Supervisory Attorney.


 Before: Ginsburg, Henderson and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Ginsburg.

 Ginsburg, Circuit Judge: Local 68 of the International 
Union of Operating Engineers, AFL-CIO, petitioned the 
National Labor Relations Board to hold a representation 
election among certain employees at a plant operated by 
petitioner Sundor Brands, Inc. Over Sundor's objection, the 
Regional Director of the NLRB approved a less than plant-
wide bargaining unit and ordered an election. Sundor ap-
pealed the Regional Director's unit determination to the 
Board, which affirmed. When the Union won the representa-
tion election, Sundor refused to bargain with it and was held 
to have committed an unfair labor practice.

 Sundor now petitions for review of the Board's order in the 
unfair labor practice case on the ground that the underlying 
bargaining unit determination is unlawful. We hold more 
narrowly that the Board failed adequately to explain its unit 
determination. Accordingly, we remand this matter for fur-
ther proceedings before the NLRB.

 I. Background

 In order to understand this controversy one must know 
something about how Sundor manages its fruit juice beverage 
plant in South Brunswick, New Jersey. Work there is orga-
nized pursuant to a team-based method of management that 
Sundor calls its "High Performance Work System." Under 
that system, the Company assigns most of its non-managerial 
employees each to a so-called team. Instead of giving re-
sponsibility for a specific task to a specific individual, the 
Company assigns all the tasks in a given part of the plant to a 
team. It may, for example, give a team in the packing 
department not only the job of operating the packing equip-
ment in its area, but also responsibility for maintaining that 
equipment and for checking the quality of the product being 
packed. Sundor expects each of its employees to be able to 
perform all of the tasks for which his team may be responsi-
ble. At least in principle, therefore, the job duties of many 
employees overlap significantly.

 Each newly hired employee starts as a "Level 1 technician" 
and receives a standard pay and benefit package. A Level 1 
technician who demonstrates a mastery of basic operational 
tasks may bid for a more specialized and better paying Level 
2 position. A similar increase in specialization and pay 
accompanies promotion to Level 3. All non-managerial em-
ployees are subject to the same disciplinary rules and stan-
dards for promotion, and all use the same parking lot, cafete-
ria, and smoking room.

 Not all non-managerial employees are members of a work 
team. Of particular relevance here, non-team members in-
clude the Maintenance Group Leaders (MGLs), the Level 3 
Electrical and Instrumentation Technicians (EITs), and the 
sole Level 3 Utilities Coordinator (UC).

 In March, 1997 the Union petitioned the Regional Director 
of the NLRB to hold a representation election for a bargain-
ing unit consisting of all full-time and regular part-time 
Advanced Maintenance Technicians (AMTs), who are team 
members; and of the EITs and UCs, who are not. Sundor 
objected to the petition, contending that the employees the 
Union sought to represent have nothing in common except 
what they also share with all non-managerial employees. 
Because of the homogenizing influence of the High Perfor-
mance Work System, the Company maintained, the only 
appropriate bargaining unit would include all the non-
managerial employees in the plant.

 After holding a hearing, the Regional Director ordered a 
representation election for a unit consisting of all AMTs, 
EITs, UCs, and MGLs. Despite the unusual organizational 
scheme in the plant, he reasoned, these groups of employees 
have a community of interest distinct from that of the other 
employees because they: (1) have specialized skills related to 
the maintenance of plant equipment; (2) are responsible for 
the performance of maintenance tasks; (3) spend some part 
of their working day in the maintenance shop; (4) interact 
frequently with each other; (5) earn relatively high salaries; 
and (6) insofar as they do maintenance work, are supervised 
separately.


 Upon Sundor's appeal, the Board generally affirmed but 
held that, because the Company had raised a substantial 
objection to their inclusion in the unit, Level 2 UCs should 
cast ballots marked as challenged. The parties did not 
receive the Board's order, however, until the election was 
underway, and four of the five Level 2 UCs had already 
voted. The Union won the election by a substantial margin 
and the Board certified it as the exclusive bargaining repre-
sentative of the employees in the designated bargaining unit.

 In order to contest the Board's unit determination, Sundor 
refused to bargain with the Union. The Board held that the 
Company thereby violated ss 8(a)(1) and (5) of the National 
Labor Relations Act, 29 U.S.C. ss 158(a)(1) and (5), and 
ordered it to bargain. Sundor now petitions for review of the 
Board's order and the Board cross-applies for its enforce-
ment.

 II. Analysis

 Under s 9(b) of the National Labor Relations Act, 29 
U.S.C. s 159(b), the Board may certify a group of employees 
as a bargaining unit only if they share a substantial "commu-
nity of interest." Bentson Contracting Co. v. NLRB, 941 
F.2d 1262, 1265 (D.C. Cir. 1991). To determine whether this 
standard is met in a particular case, the Board considers a 
variety of factors, including the employees' "wages, hours and 
other working conditions; commonality of supervision; de-
gree of skill and common functions; frequency of contact and 
interchange with other employees; and functional inte-
gration." Ore-Ida Foods, Inc., 313 N.L.R.B. 1016, 1019 
(1994), enforced, 66 F.3d 328 (7th Cir. 1995). No one factor is 
controlling. See Airco, Inc., 273 N.L.R.B. 348, 348 (1984). 
Upon judicial review the Board's unit determination, if sup-
ported by substantial evidence, see Cleveland Constr., Inc. v. 
NLRB, 44 F.3d 1010, 1014 (D.C. Cir. 1995), is entitled to 
"wide deference" from the court. Willamette Indus., Inc. v. 
NLRB, 144 F.3d 877, 878 (D.C. Cir. 1998).

 A.Adherence to Precedent

 Sundor first argues that the unit determination in this case 
constitutes an improper departure from Board precedent. 

The Board has generally presumed that a plant-wide unit is 
appropriate. See, e.g., Kalamazoo Paper Box Corp., 136 
N.L.R.B. 134, 137 (1962).* It follows, according to Sundor, 
that a smaller unit is presumptively inappropriate, yet the 
Board failed to consider whether this presumption was over-
come in this case.

 The argument is without merit. In American Hospital 
Association v. NLRB, 499 U.S. 606 (1991), the Supreme 
Court made it clear that the Board may certify any appropri-
ate unit, and is not limited to the "single most appropriate" 
one. Id. at 610. That a plant-wide unit presumptively would 
be proper, therefore, has no necessary bearing upon whether 
a smaller unit also would be proper. Rather, the Board 
applies the presumption in favor of a plant-wide unit only 
when the union proposes and the employer opposes such a 
unit, not when the union proposes a smaller unit. See, e.g., 
Airco, 273 N.L.R.B. at 348-49; see also American Hosp. 
Ass'n, 499 U.S. at 610 ("[T]he initiative in selecting an appro-
priate unit resides with the employees" seeking representa-
tion).

 Nor, Sundor's argument to the contrary notwithstanding, 
does the Board's general rule conflict with s 9(c)(5) of the 
Act, 29 U.S.C. s 159(c)(5) ("In determining whether a unit is 
appropriate ... the extent to which the employees have 
organized shall not be controlling"). To be sure, by applying 
the presumption as it does the Board gives the Union an 
initial advantage should any conflict ensue regarding the 
proper scope of the bargaining unit. This modest benefit, 
however, hardly grants "controlling" weight to the extent the 
Union has organized the employees. See NLRB v. Metropol-
itan Life Ins. Co., 380 U.S. 438, 441-42 (1965) (s 9(c)(5) "was 
not intended to prohibit the Board from considering the 
extent of organization as one factor, though not the control-
ling factor, in its unit determination").

__________
 * The Board has created one industry-specific exception to this 
general principle, but it plainly does not apply here. See Willam-
ette, 144 F.3d at 879-80 (Board has consistently approved only 
plant-wide units in the lumber industry).

 B.Substantial Evidence

 Sundor's more weighty objection is to the sufficiency of the 
evidence supporting the Board's unit determination. As not-
ed above, that decision was predicated upon the Regional 
Director's analysis of six factors. Because there is no sugges-
tion in either the Regional Director's decision or the Board's 
order affirming it that any of those factors was unnecessary 
to its decision, we must assume that the Board relied upon 
each of them. If any one is unsupported by evidence in the 
record, therefore, the Board must reconsider its unit determi-
nation. See SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) 
("The grounds upon which an administrative order must be 
judged are those upon which the record discloses that its 
action was based"). Cf. Fleshman v. West, 138 F.3d 1429, 
1433 (Fed. Cir. 1998) (remand unnecessary where it is clear 
that agency would have reached the same result had it 
applied correct reasoning). In the event, we conclude that 
there is sufficient evidence in the record to support the 
Board's reliance upon two, and perhaps a third,* of the six 
factors it invoked; its reliance upon the other three is unjusti-
fied.

__________
 * With regard to the unit members' pay, the Board's reasoning is 
not entirely clear. The Board suggests in its brief that they receive 
relatively high salaries because they are maintenance employees, 
but that is not the case. The undisputed evidence shows that 
Sundor determines its employees' pay exclusively with reference to 
their experience and skill level; maintenance employees do not earn 
more than equally skilled and equally senior non-maintenance em-
ployees. The Regional Director, however, may have meant only to 
distinguish unit members, all of whom are Level 3 employees, from 
non-unit employees, the majority of whom are at Levels 1 and 2. 
Because the Board is not required to identify the most appropriate 
unit, but only an appropriate one, see American Hosp. Ass'n, 499 
U.S. at 610, a showing that the unit members are better paid than 
most non-unit employees may provide a degree of support for the 
conclusion that they have a distinct community of interests. Upon 
remand, the Board will have to clarify its reasoning if it wants to 
rely upon this ground.


 First (in the latter category) is the degree to which the 
employees in the unit interact with each other. The Board 
points to testimony suggesting that the MGLs and the AMTs 
have largely overlapping job responsibilities, and that the 
AMTs are generally responsible for performing planned 
maintenance work on production equipment. It also cites 
evidence that Level 3 EITs regularly work alongside other 
employees both within the designated unit as well as those 
excluded from it, and that the "maintenance personnel" at-
tend a monthly meeting.

 How the Board could conclude from this evidence that the 
employees in the unit interact frequently with each other 
eludes us. That the AMTs and the MGLs may have common 
job duties does not mean they work together in performing 
those duties. As to the Level 3 EITs, testimony in the record 
confirms that they work with other unit employees in "main-
tenance or trouble-shooting functions" but there is no indica-
tion whether they do so with any frequency. The Board's 
strongest point--but only by default--concerns the monthly 
maintenance meetings: They show that members of the unit 
have at least some contact with each other. As Sundor points 
out, however, the AMTs attend meetings with employees 
outside the unit not monthly but daily, and the UC interacts 
most consistently with other utilities employees, not with 
other members of the disputed unit. Perhaps the monthly 
maintenance meetings are for some reason so significant that 
they outweigh the apparently extensive, indeed daily, interac-
tion the AMTs have with employees outside the unit. The 
Board has not, however, claimed as much, let alone told us 
why.

 Second, the Board based its decision in part upon the 
Regional Director's conclusion that "[a]lthough most of [Sun-
dor's] skilled maintenance employees are members of teams 
and receive some direction from team leaders, they receive 
separate direction concerning the performance of their skilled 
maintenance duties." Again, we fail to see how this factor, on 
the facts of this case, lends any support to the Board's unit 
determination. The Board admits--indeed, puzzlingly, seems 
to assert--that each of the four groups in the bargaining unit, 


even insofar as they do maintenance work, is supervised 
separately, and that only two of them (the MGLs and the 
AMTs) have even one supervisor (the Technology Manager) 
in common. If, upon remand, the Board is to adhere to its 
present unit determination, therefore, it must explain why 
that decision is justified in spite of, not because of, the 
disparate supervision of the employees in the unit.

 Finally, the Board asserts that the employees in the unit 
have the common task of ensuring that equipment at the 
plant is properly maintained. At least as to the Level 3 UC, 
however, that claim is grossly overstated. The testimony 
describing the UC's responsibilities is that he does mainte-
nance work only to fill in for a Level 2 UC who is on vacation 
or otherwise unavailable; the bulk of his time is devoted to 
training more junior utilities personnel. Insofar as the 
Board's decision to include the Level 3 UC is based upon his 
responsibility for the maintenance of equipment, therefore, it 
is unsupported by substantial evidence.

 In short, three of the six factors upon which the Board 
relied in reaching its decision are, in whole or in part, without 
support in the record. In these circumstances, we must 
remand this matter for the Board to reconsider its decision. 
In so doing we express no opinion upon the question whether 
the factors for which there is support in the record could 
suffice by themselves to support the Board's present unit 
determination.

 C.Late Notice of the Board's Order

 Sundor maintains that the Board, by failing to inform the 
parties before voting began that the Level 2 UCs were to cast 
challenged ballots, unfairly interfered with the election. Em-
ployees who voted for the Union believing that it would 
represent the Level 2 UCs, the Company suggests, may have 
voted differently had they known that those employees would 
likely be excluded from the unit.

 Whatever the merits of this contention, Sundor did not 
timely raise it before the Board. Under 29 C.F.R. 
s 102.69(a), an objection to conduct allegedly affecting the 

result of a representation election must be made within seven 
days of the Board's tally of the ballots. Because the Compa-
ny neither raised its objection in a timely fashion nor alleged 
special circumstances that could excuse its tardiness, the 
Board properly declined to consider it.

 III. Conclusion

 For the foregoing reasons, the petition for review is grant-
ed, the Board's cross-application for enforcement is denied, 
and this matter is remanded to the Board for further pro-
ceedings.

 So ordered.